IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LEE ANN LOWRY,                    )
                                  )
        Plaintiff,                )
                                  )
v.                                )    CIVIL ACTION NO. 99-JEO-0314-S
                                  )
ALLSTATE INSURANCE CO.,           )
                                  )
        Defendant.                )

## MEMORANDUM OPINION

In this action, plaintiff Lee Ann Lowry ("Lowry" or "the plaintiff"), a former employee of defendant Allstate Insurance Company ("Allstate" or "the defendant"), asserts in her complaint that her manager at Allstate, Jackie Quinn, "treated the female employees poorly while she treated the male employees with deference," she "assigned less work to the male employees," and she terminated [the p]laintiff for not keeping up with her workload when she had assigned significantly more work to [the p]laintiff than she had the male employees," in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.  (Doc. 1, ¶ 7). Presently before the court is the defendant's motion for summary judgment and the plaintiff's motion to strike portions of an affidavit offered by the defendant in support of the motion for summary judgment.  Upon due consideration, the undersigned finds that the motion to strike is due to be granted in part and denied in part and the motion for summary judgment is due to be granted.

## I. BACKGROUND

The plaintiff worked at Allstate's Market Claims Office ("MCO") in Birmingham, Alabama, from October 1995 to February 1998.  (Doc. 28, Ex. A, Lowry Deposition ("Lowry"),

pp. 61, 241).  The MCO handled automobile and homeowner insurance claims for Allstate's

central Alabama region.  (Doc. 28, Ex. D, Harris Affidavit ("Harris") at ¶ 3).  It was comprised

of "four major departments: Automobile Liability, Casualty Operations, Homeowners, and

Automobile Field Operations.  (*Id*.).  The Casualty Operations department "handled claims made

against Allstate's policyholders where an injury had occurred as a result of an automobile or in-

home incident."  (*Id*. at ¶ 4).  It "was divided into two units: Represented and Unrepresented.

The Represented unit handled claims where the claimant was represented by an attorney.  The

Unrepresented unit handled claims where there was no attorney representation." *Id*.  The plaintiff

worked as a claims representative in the "attorney-represented unit" during the times relevant to

this litigation.  (*Id*. at ¶ 4; Lowry, pp. 61-62)*.*

     At the time that the plaintiff was hired by Allstate, she already had approximately

eighteen years experience as a claims representative or adjuster.  (Lowry, Def. Ex. 2).  She had

previously worked for Travelers Insurance Company, Omni Insurance Company, Alexander

Underwriters, Inc., Georgia-Pacific Corporation,[1] Occidental Fire & Casualty and Insurance

Time General Agency.  (*Id*.).  She had extensive experience in handling claims similar to the

type of claims she was required to address in her position at Allstate.  (Lowry, pp. 34-35, 37, 41-

49).  Her workload at Allstate was comparable to her workload in her prior positions.  At

Allstate, her pending claims files numbered consistently less than 200 per month;[2] whereas, her

previous pending claims files at the other companies numbered from approximately 160 to 300

per month.  (Lowry, pp. 38-40).  The procedures at Allstate were relatively similar to those in the

---

[1] While working for Georgia-Pacific, she was involved in risk management, monitoring subrogation claims for the company.  (Lowry, p. 44 & Ex. 2).

[2] The only exception to this is November 1997 when her pending files numbered 203. (Harris, Attachment-D 0686).

other positions the plaintiff had worked, except that she had less discretion in settling claims at Allstate than she did with the others. (Lowry, pp. 36, 39-40, 46-49).

When she was interviewed for the Allstate job, she was told what her duties would involve, including the type of files she would be handling and the procedures she would be required to follow. (Lowry, pp. 57-59). She was told that her duties would be "basically what [she] had been doing in the past, claims handling, attorney-represented files, bodily injury." (Lowry, p. 57). Her starting salary reflected her previous experience in the industry. (Harris, ¶ 26).

After she was hired, she was given several weeks of training on how to handle claims. (Lowry, pp. 63-64). She also received some additional guidance on a daily basis when she began work. (*Id.*, pp. 64-65). By about February 1996, she was assigned the bulk of claims that she would be responsible for handling. (*Id.*, pp. 65-66). They were bodily injury claims. (*Id.*, p. 66).

The composition of the management in the unit in which the plaintiff worked changed during her tenure there. During the relevant time, from the beginning of 1996 through the plaintiff's termination, she had various supervisors. (Lowry, pp. 75, 77). The first, Paquita Adkins, left a short time after the plaintiff arrived. (Lowry, p. 75). The next three were Ronnie Prine, Sherry Houk and Jackie Quinn. (Lowry, p. 77). Prine became the unit supervisor in January 1996. (Harris, ¶ 15). Houk replaced Prine in January 1997. (*Id.*). Around November or December 1997, Quinn began as the temporary supervisor, replacing Houk. (*Id.*). She also continued to serve as Allstate's Frontline Process Expert in the casualty division. (*Id.*, ¶ 11). As the Frontline Process Expert, Quinn was responsible for overseeing the casualty division's "overall quality and the casualty operations processes, procedures, training, severity control,

3

[and] expense control." (Quinn, ¶¶ 15-16). Eddie Jeely was the Evaluation Consultant ("EC") for the Casualty Operations Division. (Harris, ¶ 9). He "was responsible for reviewing the adjuster's recommended settlement amount" and the "adjuster's investigation and processing of the claim[s]." (*Id.*). Herb Harris, the Market Claims Manager, supervised the plaintiff's unit, including Quinn and Jeely. (*Id.*, ¶¶ 2, 15). The plaintiff claims that only Jackie Quinn discriminated against her on the basis of her gender. (Lowry, p. 77).

There were three adjusters in the unit in January 1997 besides the plaintiff: Eric Rainey, Geraldine "Jeri" Dillard, and Lee Barnes. (Harris, ¶ 17). In about May 1997, Heath Gray replaced Barnes, who retired the following month. (*Id.*). Rainey was terminated in about June 1997 for poor performance. (*Id.*). He was replaced by Jennifer James. (*Id.*). From August until the plaintiff's termination, the composition of the unit remained the same with the plaintiff, Gray, Dillard, and James working as adjusters. (Lowry, p. 74). Ms. Dillard was the only adjuster handling the same type of files as the plaintiff. (*Id.*).

The files were assigned by Christi Colquett, a "good friend[ ]" of the plaintiff. (Doc. 28, Ex. E ("Colquett"), ¶ 3). Because the plaintiff and Dillard worked on the same type of files, Colquett would assign the new files to one of them on an alternating basis. (*Id.*, ¶¶ 4-6). Occasionally, Colquett would assign specific files to specific adjusters when directed by the supervisor of the unit.[3] (*Id.*, ¶ 7).

The plaintiff's evaluation under Prine in March 1996 resulted in an assessment that she meet expectations. (Doc. 31, Quinn Deposition ("Quinn"), pp. 17-18). On April 8, 1996, Prine noted concerns he was having with the plaintiff's production by documenting them in a letter to

---

[3] Collquett stated that Prine and Houk made special assignments more frequently than Quinn. (Colquett, ¶ 7).

Lowry and his (Prine's) supervisor.  Therein, he detailed the efforts he implemented to assist the plaintiff in "more effectively" using her time to improve her ability to close claim files.  (Lowry, Ex.7, pp. 1-2).  This included her working with Jeely to observe the proper documentation and disposal of claims files.

In a January 13, 1997 letter that was precipitated by a file review, Lowry stated that although she was behind on her diary follow up, she felt the review made her situation appear worse than it actually was.  (Lowry, Ex. 10).  She attributed her difficulties to Allstate's claim evaluation system.  (*Id.*).

In February 1997, Houk evaluated the plaintiff as meeting expectations.  Houk did note, however, that there were quality concerns relative to her failure to aggressively purse certain matters with attorneys and injury documentation and trial alert preparation.  (Lowry, Ex. 9, p. 1).  Houk stated in the review that Lowry "has the knowledge and experience to correct these areas with minimal supervision."  (*Id.*).  The plaintiff agreed with Houk's assessment.  (*Id.*, p. 2).

After the February evaluation, Houk documented several concerns she had regarding Lowry's handling of certain files.  She noted that around March 4, 1997, Lowry improperly determined the liability issue in a case.  (Lowry, Ex. 12).  She was written up and the incident was discussed in a coaching session with Lowry.  (*Id.*).  In a letter to the plaintiff on April 8, 1997, concerning her submission of certain files for the company's "Winning Negotiations" program, Houk noted that the submissions were unacceptable because of the lack of timeliness and the absence of "any aggressive handling on [her] part."  (Lowry, p. 174; *Id.*, Ex. 15).  On about March 10, 1997, Houk talked with the plaintiff concerning her error in closing another file.  (*Id.*, Ex. 13).  She was written up on April 10, 1997, because, according to the last entry in the file, there had been no action in almost nine months.  (Lowry, p. 176; *Id.*, Ex. 16).  On about

5

May 19, 1997, Houk had a conversation with the plaintiff concerning her improperly closing

another file. (Lowry, pp. 173-74; *Id.*, Ex. 14).  On June 10, 1997, the plaintiff was told by Houk

that a review of a computer generated printout of her pending files indicated that she was not

utilizing her computer printouts as a means of controlling her pending files. (Lowry, pp. 179-81;

*Id.*, Ex. 17).  She was criticized by Houk on July 14, 1997, for delivering a file to the EC without

specifying the number of "impacts" as was required. (*Id.*, Ex. 19).  On the following day, July

15, 1997, Houk wrote the plaintiff, stating that her (Houk's) contact with an employee of the

claimant's attorney revealed that one of Lowry's files improperly reflected that an offer had been

made when, in fact, none had been made.[4]

The plaintiff received a "Requires Improvement Evaluation" ("RIE") on November 4,

1997. (Lowry, Ex. 21).  A RIE was described by Harris as "a standard Allstate method of

notifying an employee that improved performance is required.  The evaluation is designed to

assist the employee in correcting performance deficiencies and to notify him or her of the serious

nature of the situation." (Harris, ¶ 19).  According to Harris, "If an employee fails to meet the

established requirements in the [RIE] or fails to make a reasonable effort toward meeting the

requirements, further administrative action is warranted." (*Id.*).  Lowry's RIE provides:

> Lee Ann, the purpose for this review is to formally evaluate your performance
> over the past three quarters.  During that time I have noted areas of accountability
> that do not meet the expected level for the position.  These areas have been
> discussed with you at quarterly checkpoint meetings and are reoccuring (sic).
> Based on these results you are being placed on a Requires Improvement PDS.
>
> Your performance requires immediate improvement in the following areas:
> Disposition, Litigation Management/Trial Alerts, Damage Investigation,
> Evaluation and Negotiations.  These areas have been discussed with you during
> this time.  At the present juncture no significant improvement has been noted in

---

[4] The plaintiff disputes the accuracy of Houk's statement that an offer had not been made. (Lowry, pp. 186-88).

6

your overall performance. . . .

(Lowry, Ex. 21).  It also lists various files which Allstate asserts contained deficiencies.  (*Id.*).

The evaluation was done by Houk (Lowry, p. 195) and approved by two other persons.  (Lowry,

Ex. 21, p. 3).  Although Quinn's name is not on the document as an approving individual, the

plaintiff asserts she must have been involved in the evaluation as she was Quinn's supervisor.

(Lowry, pp. 196).  According to the documentation after the evaluation, the plaintiff did not

comment on the RIE.  (Lowry, Ex. 22).

Approximately three weeks later, Houk prepared a "30 Day Follow Up (sic) PDS

Evaluation."[5]  (Lowry, Ex. 23).  Houk stated that she "did not see a sustained or substantial

improvement in [Lowry's] overall handling" of her claim files.  (*Id.*).  It provided eight examples

by file number and concluded that if she "continue[d] to perform at this level [she would] be

recommended for a 'Job-In-Jeopardy' evaluation at the end of the review period. . . ."  (*Id.*, p. 2).

The "30 Day Follow-up" was discussed with the plaintiff by Greg Hill, who was in Human

Resources, and Quinn on December 4, 1997.  (Lowry, Ex. 24).  According to the memorandum

Quinn wrote after the session, the plaintiff did not have any questions, but did request a copy of

the RI evaluation.  (*Id.*).  It was provided to her.[6]  (*Id.*).

On January 13, 1998, a "Job-in-Jeopardy" ("JIJ") evaluation was issued concerning the

plaintiff because of her "unacceptable claim handling."[7]  (Lowry, Ex. 25).  It informed her that

---

[5] The 30-day reviews are done "in order to assess whether the employee's performance has improved.  These follow-ups are typically conducted by the unit supervisor."  (Harris, ¶ 22).

[6] Quinn was appointed as a temporary supervisor of the Casualty Claims Unit at some time between the date Houk prepared the 30 Day Follow-up PDS Evaluation memorandum and the meeting with the plaintiff.  (Lowry, Exs. 23 & 24; Harris, ¶ 7).

[7] A JIJ "is reserved for situations that are sufficiently serious such that the employee must be notified that failure to meet the established requirements of the JIJ within a stated time period will result in his or her termination."  (Harris, ¶ 20).

she would be recommended for termination if she did not correct the deficiencies within 60 days.

(*Id*.). The notice was premised on previous deficiencies. It stated:

> The quality of your files was discovered to be unacceptable in October, 1997 and you were placed on a "Requires Immediate Improvement" PDS in November. A follow-up review was completed in December in which significant and substantial improvement was not evidenced in your handling. A second follow-up was completed in January, 1998 and again there was no noticeable improvement in your overall handling specifically in file direction/disposition.

(*Id*.). Harris approved the review on January 2, 1998. (*Id*., p. 2). Quinn approved the review as

the plaintiff's immediate supervisor. It was presented to the plaintiff on January 13, 1998. (*Id*.).

Jeely conducted a file review of the adjusters about January 22, 1998. Adjusters Jeri

Dillard and Jennifer James were found to be in compliance with Allstate's procedures. The

plaintiff was not. (Lowry, Ex. 27). On January 23, 1998, Quinn did a follow-up review to

measure the plaintiff's progress. She stated that the plaintiff had not made "immediate and

substantial improvement." (Lowry, Ex. 29).

On January 28, 1998, the plaintiff called Greg Hill in the Human Resources Department.

He arranged a meeting with her for that afternoon. Hill's letter to the Human Resources

Division Manager summarizes the meeting:

> Lee Ann stated in our meeting that she felt uncomfortable approaching Jackie [Quinn] about claims that she needed advice on because of a possible "personality conflict between she and Jackie". Lee Ann also said that she feels "Jackie intentionally ignores her" and "shows favoritism towards the men in her unit." I asked Lee Ann if she could provide me with an example, and if anyone else in her unit had witnessed Jackie's alleged behavior. Lee Ann then discussed a situation in which Jackie was "demeaning towards her because of a claim that was not properly handled." Lee Ann thought that employee Christy Colquett (sic) might have overheard the discussion, but she could not be sure. Lee Ann then asked me if some of her pending files could be distributed to other employee's (sic) in her unit to allow her to catch up on her work. I reminded Lee Ann that she was being reviewed on the cases that she was working when the requires improvement reviews initially started and that it was not possible to route her files to other representatives in her unit. The last issue with Lee Ann was that Jackie

8

did not administer the last requires improvement review to her. Lee Ann said that "Jackie Laid (sic) it on her desk while she was at lunch." I asked her if she had any conversations with Jackie after that and she stated that she had not discussed the review with her at all. I told Lee Ann that I would arrange a meeting the next day to discuss the review and the other issues. I also asked Lee Ann if there was any type of personal or medical problem that might be hindering her efforts and she stated that there was nothing going on medically, but she was having stress due to her situation. I again offered her the Employee Assistance Program and encouraged her to call for assistance.

(Lowry, Ex. 30, p. 1). Hill discussed the concerns with Quinn and they met with the plaintiff. They went "over the last review," Quinn offered to help the plaintiff "in any way possible," and she "apologized" to the plaintiff "for the way she handled the discussion with her regarding the claim that upset" the plaintiff. (*Id.*). Quinn also "reiterated" to the plaintiff that "she [(the plaintiff)] was accountable for handling her own pending files and that there would not be a shift of her caseload to any of the other representatives." (*Id.*). They agreed that a follow-up meeting would take place in two weeks. (*Id.*).

Another "bi-weekly" review was noted on February 6, 1998. The documentation, which was provided to the plaintiff, reveals no "immediate and substantial improvement." (Lowry, Ex. 31).

On February 9, 1998, the plaintiff was in Hill's office for another review by Hill and Quinn. During the meeting, she was told that she was going to be terminated premised on their recommendation. (Lowry, pp. 241-42). She determined that she could either wait for the results of their recommendation or she could resign. She decided to resign. She prepared a letter of resignation in their presence and she gave it to Hill. (Lowry, p. 242; *Id.*, Ex. 32).

Prior to the plaintiff's termination, Allstate was "searching" for an additional adjuster for her department. (Harris, ¶ 27). On an unspecified date after an interview of a female applicant for the adjuster's position, Lowry heard Quinn state, "If she's that cute, we don't want her [(the

9

applicant)] here in our department." (Lowry, p. 334, 338-40).  Scott Walker initially was hired

in the unit as a trainee in late February 1998.  (*Id*.).  When the plaintiff left, her files were

distributed among the remaining adjusters: Dillard, Gray and James.  (*Id*.).  Another male was

hired as a "temporary, independent adjuster."  (*Id*.).  A few months later, the temporary adjuster

left and, ultimately, Chris Zaragoza was transferred from another unit.  (*Id*.).  James also

returned to her regular assignment in the Uninsured and Underinsured Motorist division.  (*Id*.).

Walker took over Gray's responsibilities in the Minor Impact Soft Tissue Claims area and

Dillard, Gray and Zargoza handled the "straight bodily injury claims."  (*Id*.).

     Dillard left the unit in March 1999.  (December 18, 2000, letter to the court ("Dillard"),

p. 20).  She had previously submitted her resignation in about October 1997.  She did that

because she felt that Quinn "had said some harsh words to [her] in front of other people, and

[she] just didn't think that [she] wanted to work under those type situations."  (*Id*., p. 20).

## II. MOTION TO STRIKE PORTIONS OF ALLSTATE'S EVIDENTIARY SUBMISSION (HARRIS'S AFFIDAVIT) THAT FAIL TO MEET THE REQUIREMENTS OF RULE 56(E)

     Lowry asks the court to strike portions of Herb Harris's affidavit because they fail to

meet the requirements of Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE.  Rule 56(e)

states, in pertinent part, that affidavits in support of or in opposition to a motion for summary

judgment ". . . shall be made on personal knowledge, shall set forth such facts as would be

admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the

matters stated therein."  FED. R. CIV. P. 56(e).  If a supporting or opposing affidavit fails to

conform to Rule 56(e), the opposing party may move to strike the nonconforming portion or

portions.  *Ali v. City of Clearwater*, 915 F. Supp. 1231, 1236 (M.D. Fla. 1996), citing *Interfase

Marketing, Inc. v. Pioneer Technologies Group, Inc.*, 1993 WL 229601, *2 (M.D. Fla. June 23,

1993), *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1529 (M.D. Fla.1989)).

Herb Harris is the Market Claims Manager for Allstate at the Birmingham Market Claims Office where Lowry worked. He has held that position, which requires that he oversee the operations and personnel at the Birmingham office, since 1992. (Harris, ¶ 2). In the affidavit, he explains how the office functioned and was staffed during the relevant time; the role of an adjuster, such as Lowry; the process used by Allstate in dealing with performance issues; and his involvement in the termination of Lowry and another male employee, Eric Rainey. Also attached to the affidavit are various production reports involving Lowry, which are maintained by Allstate in the normal course of its business operations. (*Id.*, ¶ 28).

Lowry asserts in her motion to strike that portions of the affidavit are due to be struck because (1) they are not premised on the personal knowledge of Harris, (2) the documents upon which the statements are premised are not attached to the affidavit, and (3) Harris's lay opinions are inadmissible. (Doc. 30). Allstate filed a response, including a supplemental affidavit from Harris. (Doc. 32). Lowry next filed a reply asserting that much of the original affidavit was irrelevant because it was not cited in Allstate's brief. (Doc. 33). Allstate then filed a second response, disagreeing with Lowry's assertion that much of the entire affidavit is irrelevant. (Doc. 34, ¶ 3).

### A. Relevance

Because it is the most sweeping objection to the affidavit, the court will begin its review of Lowry's motion with the challenge that the majority of the affidavit is due to be stricken because it is irrelevant. The court is not impressed with this general objection. Rule 402 of the FEDERAL RULES OF EVIDENCE provides that all relevant evidence is admissible. FED. R. EVID. 402. However, as pointed out by Allstate, much of the material in the affidavit is "foundational

11

and background information" that permits the court to place the applicable events in context. (Doc. 34, ¶ 3). To exclude this information would be detrimental to both sides and would be inconsistent with the purpose and intent of the FEDERAL RULES OF EVIDENCE. *See* FED. R. EVID. 102. Accordingly, the motion is due to be denied on this challenge.

### B. Personal Knowledge

Lowry argues that certain of the statements in Harris's affidavit are not admissible because they are not within Harris's personal knowledge. Specifically, she states that the following is inadmissible:

1. Harris's statements concerning the steps followed by Allstate in Rainey's termination (¶ 18)[8];

2. Harris's statements concerning the "Requires Improvement" evaluations and procedures used in the termination of Rainey and Lowry (last paragraph of ¶ 21);

3. Harris's statement that the unit supervisor concluded, as he did, that neither Rainey or Lowry substantially improved while they were being reviewed based on their previous performance (¶ 24); and,

4. Harris's statements about Lowry and Gray's salaries.

(Doc. 30).

A statement that is not supported by evidence of personal knowledge of specific facts that would demonstrate that the statement would be admissible at trial or to avoid summary judgment should not be considered. *See Givhan v. Electronic Engineers, Inc.*, 4 F. Supp. 2d 1331, 1335 (M.D. Ala. 1998) (Statement in affidavit which fails to show factual basis for personal knowledge of the matter does not meet the requirements of Rule 56(e)); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1048 n.6 (5th Cir. 1996) ("This vague and conclusory statement

---

[8] These paragraph references are to the objected-to portions of Harris's affidavit.

– which includes no reference to racial remarks – fails to 'designate specific facts' – such as

what was said, to whom it was said, or even who made the comments – sufficient to avoid

summary judgment.").

### 1. Rainey's termination

The pertinent challenged paragraph provides:

> Prior to Mr. Rainey's termination and in accordance with Allstate
> procedure, Mr. Rainey had been counseled on several occasions about his
> performance by the unit supervisor (Ronnie Prine and, later, Sherry Houk).
> Jackie Quinn, as Casualty Claim Manager (later known as Frontline Process
> Expert), also participated in some of these counseling sessions.  The claim files
> handled by Mr. Rainey were also periodically reviewed to assess his compliance
> with company procedures.

> Mr. Rainey's performance problems were similar to Ms. Lowry's.
> Among other things, he had problems in investigating, following up in a timely
> fashion, and negotiating settlements of his claims.  When informal counseling
> sessions did not result in substantial improvement in Mr. Rainey's performance,
> he was issued a Requires Improvement (RI) evaluation and informed that if he did
> not demonstrate immediate and substantial improvement, he would be
> recommended for a Job in Jeopardy (JIJ) evaluation.  Mr. Rainey's performance
> was subsequently monitored and, when it did not improve, he was issued a JIJ by
> Sherry Houk, with my approval.  After issuance of the JIJ, Mr. Rainey's
> performance still did not improve to an acceptable level.  I therefore
> recommended him for termination.

(Doc. 28, Ex. D, ¶ 18).  Lowry's objection is reasonable, however, a review of the entire record,

including Harris's affidavit and supplemental affidavit, demonstrates that he had the requisite

personal knowledge of the two situations (Rainey and Lowry) to overcome the objection.

Reading paragraph 18 in its entirety, it becomes evident that he was personally involved in

Rainey's termination.  In fact, the closing sentence states that his recommendation to terminate

Rainey was premised on the preceding information which includes much of the information

objected to by Lowry.  (Doc. 28, Ex. D, ¶ 18).  Additionally, his supplemental affidavit states

that he had personal knowledge of the information in the original affidavit.  (Doc. 32, Ex. A., ¶

1). Still further, his affidavit states that he has been overseeing "all operations and personnel" at the Birmingham office since 1992. (Doc. 28, Ex. D, ¶ 1). The court is satisfied that under the circumstances, the motion to strike this portion of the affidavit is due to be denied on this ground.

### 2. References to claim files and requires improvement evaluations

Lowry next objects to the references in paragraph 21 to claim files and requires improvement evaluations by Harris. Paragraph 21 provides:

> The unit supervisor typically drafts and administers the Requires Improvement (RI) evaluation to the employee. Before the RI is administered to the employee, I review it, as well as all of the claim files that are referenced in the RI. The purpose of my review is to make sure that the problems identified by the unit supervisor are in fact correct. If I conclude, based on my independent review of the adjuster's claim files, that the RI is accurate, I then recommend to my supervisor, Bryan Walker (Claim Service Manager in Nashville, Tennessee), that the RI be administered to the adjuster. Mr. Walker is also responsible for reviewing the RI to make sure it complies with Allstate's procedures and that problem areas have been appropriately identified.

> If the RI is acceptable to Mr. Walker, he then sends it to the Human Resources Department for its approval. That department is responsible for reviewing the RI again to make sure that it is consistent with Allstate procedure. If Human Resources approves the RI, it is then returned to me and I forward it to the unit supervisor so that he or she can administer it to the employee.

> This entire procedure was followed prior to the issuance of RI evaluations to Ms. Lowry and to Mr. Rainey. In particular, I conducted an independent review of the claim files identified in Mr. Rainey's and Ms. Lowry's RI. In both situations, I concluded that the unit supervisor's recommendation that an (sic) RI be issued was appropriate.

(Doc. 28, Ex. D, ¶ 21). A close review of this section of the affidavit shows that, for the most part, it details the performance review process for a person whose performance has been called into question. As already noted, based on Harris's position and experience, these are matters within his personal knowledge. Additionally, his reference to the procedures that were followed

with regard to the termination of Rainey and Lowry is based on his experience and involvement in those matters. Accordingly, the court is satisfied that the motion is due to be denied on this basis.

### 3. Conclusion of the unit supervisor

Lowry next objects to the reference in paragraph 24 by Harris to the fact that ". . . the unit supervisor and I concluded, based on our review, that substantial improvement had not occurred" during the review periods for Rainey and Lowry. (Doc. 28, Ex. D, ¶ 24). The argument that Harris lacked personal knowledge of what the unit supervisor concluded would have appeal if it were taken out of context. However, that would be inappropriate. Looking at the entire record, particularly Harris's affidavits, it is evident his awareness of the unit supervisor's agreement in the absence of "substantial performance" was premised on their discussions. The preceding sentences to the objected-to conclusion state:

> Following the issuance of the JIJ, the unit supervisor conducts periodic reviews of the adjuster's files to determine if there has been substantial improvement in the adjuster's performance. The unit supervisor, in turn, discusses his or her findings with me and I would review the claim files in question to verify the unit supervisor's findings.

(*Id.*, ¶ 24). The motion is due to be denied as to this challenge.

### 4. Salary

The last portion of the second category of objections concerns Harris's statement in the affidavit that "[t]hroughout her employment with Allstate, Ms. Lowry's salary was higher than Heath Gray because she had more experience as an adjuster than he did." (Doc. 28, Ex. D., ¶ 26). Lowry asserts, among other things, that Harris lacked personal knowledge of this fact. The affidavit discounts this premised on the statements in the opening portion of the same paragraph, which provides, "As Market Claims Manager, I am also involved in approving salaries and

15

salary increases. . . . For that reason, I am familiar with Ms. Lowry's salary and salary increases." (*Id.*). Accordingly, the objection is due to be denied.

### C. Documents Not Attached and Hearsay

#### 1. FEDERAL RULE OF CIVIL PROCEDURE 56(e)

Lowry next notes that Harris's affidavit does not included copies of the documents he reviewed in preparing the affidavit. (Doc. 30, ¶¶ 2-7). The only documents that are attached are the monthly reports for Lowry's unit. FEDERAL RULE OF CIVIL PROCEDURE 56(e) provides in pertinent part:

> **(e) Form of Affidavits; Further Testimony; Defense Required.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. . . .

FED. R. CIV. P. 56(e). The plaintiff has the responsibility to object to the form or content of the affidavit or it will be deemed waived. *See H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454 (2nd Cir. 1991) ("This rule does not, as appellee suggests, require that parties authenticate documents where appellee did not challenge the authenticity of the documents in the district court. *See* 10 A. C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2722 at 60 & n.38 (2d ed. 1983 & Supp. 1991) (collecting cases)"); *United States v. Monkey*, 725 F.2d 1007, 1011 n.4 (5th Cir. 1984) (Objections to authenticity concerning records are waived by a failure to raise them in the lower court). Here, the plaintiff has objected. The defendant has responded by submitting a supplemental affidavit from Harris, a memorandum and case law. (Doc. 32).

As will be discussed further below, Harris's supplemental affidavit satisfies the court that

the documents he examined were business records of the defendant.  However, the defendant's

response and Harris's affidavit do not adequately address the plaintiff's objection to the fact that

proper copies of the documents he reviewed were not attached to the affidavit as required by

Rule 56(e).  To the extent that the defendant relies on *Kitchen v. TTX Company*, 1999 U.S. Dist.

LEXIS 8141, *11-13 (N.D. Ill. May 26, 1999), this court finds it is not particularly helpful.  In

*Kitchen*, the plaintiffs brought a discrimination case against the TTX.  The parties moved for

summary judgment and to strike certain pleadings.  The plaintiff moved, *inter alia*, to strike a

defense affidavit because no supporting documents were attached.  *Id.*, at 11.  The court stated:

> Finally, Ms. Pomeroy's affidavit included statements which are not
> supported by attached documents.  These statements concern Ms. Ruth's EEOC
> charge and Mr. Kalkowski's salary and job history.  Since the statement regarding
> the EEOC charge is obviously excepted from the EEOC document, the Court
> declines to strike the statement in paragraph 16 of her affidavit or paragraphs 21,
> 22, and 41 of Defendant's 12(m) statement regarding Ms. Ruth's EEOC charge.
> However, since statements concerning Mr. Kalkowski's precise salary and job
> history are based on personnel records not included in Defendant's exhibits, the
> Court will not consider them. . . .

*Id.*, at 14.  Although the defendant "need not supply a mountain of evidence to support the

statement" by Harris, it must be supported by "personal knowledge" from his experience or

observations.  *Id.*, at 6.  Accordingly, to the extent the statements in Harris's affidavit are

premised on his actual knowledge, as demonstrated therein or in the supplemental affidavit, they

will be allowed.  To the extent that Harris's statements are premised on his review of records and

documents that are not attached to the affidavit or submitted in the defendant's evidentiary

submission, the plaintiff's motion to strike will be granted and the statements excluded.

The plaintiff first objects to paragraph 18 of Harris's affidavit, stating that it is

objectionable to the extent Harris bases his statements upon documents that are not attached.

(Doc. 30, ¶ 2).   Paragraph 18, which is quoted above,[9] states that Rainey had performance problems similar to the plaintiff and was terminated.  (Doc. 28, Ex. D, ¶ 18).  Because the court cannot discern what portion of his assessment was based on his review of documents instead of his personal knowledge, the comparison is not allowed.

The plaintiff next objects to the last subparagraph of paragraph 21.[10]  It states that Harris reviewed RI evaluations and claim files involving the plaintiff and Rainey.  Because the defendant chose not to attach the pertinent claim files and evaluations (particularly as to Rainey), the court will limit its consideration of the paragraph and will not consider the information concerning the comparison between the plaintiff and Rainey.  However, because the RI evaluation on Lowry (doc. 28, ex. A, # 21) is included in the defendant's exhibits without objection, it will be considered.

The plaintiff next objects to paragraphs 22, 23, 24, and 25 because the documents that Harris reviewed were not attached.  Each paragraph states that Harris conducted some type of independent review of various claim files.  (Doc. 28, ¶¶ 22-25).  Because the reviews are based, at least in part, on documents not before the court, the statements are due to be struck to the extent that Harris seeks to compare the plaintiff and Rainey.  However, Harris's explanation of his participation in the termination of the plaintiff and his statements concerning the plaintiff are allowed to the extent he demonstrates personal knowledge of the events and to the extent documentary evidence is properly before the court, such as the plaintiff's RI evaluation, her JIJ evaluation, and the documented follow-ups.

_____

[9] See page 13.

[10] Pagagraph 21 is quoted on page 14.

Lastly, in paragraph 26, the plaintiff objects to any salary comparisons made by Harris. Premised on Harris's statement that he has overseen operations and personnel at the Birmingham MCO since 1992 and his further statement that he has been "involved in approving salaries and salary increases," the court finds that the motion to strike is due to be denied as to this paragraph on this ground. (Harris, ¶¶ 2, 26).

Even though the Harris affidavit contains some inadmissible evidence, the court is not required to strike the entire affidavit. *Givhan*, 4 F. Supp. 2d at 1334 n.2. "The court may strike or disregard the inadmissible portions and consider the rest of the affidavit." *Id.* Accordingly, the limited portions referenced above will be struck and the remainder of the evidence will be considered.

### 2. FEDERAL RULE OF EVIDENCE 803(b)

Lowry also moves to strike numerous statements in Harris's affidavit based on the fact that they are also based on hearsay. (Doc. 30, p. 1). Allstate argues that the purported hearsay statements are either not hearsay because they are not offered to prove the truth of the stated matter, but to show the effect on a particular person, or if they are hearsay, they are premised on the exception to the hearsay rule for business records. (Doc. 32, pp. 4-8).

The court finds that to the extent that Harris reviewed various documents, including claim files, "Job-In-Jeopardy" assessments, follow-ups, etc., concerning the plaintiff, the record adequately demonstrates that those documents are business records as defined by FEDERAL RULE OF EVIDENCE 803(6). The general rule is that inadmissible hearsay cannot defeat a motion for summary judgment where there is no indication that it is reducible to a form that would be admissible at trial. *See Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1135, *amended in part on rehearing*, 102 F.3d 1118 (11th Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S. Ct. 2453, 138

L. Ed. 2d 211 (1997).  An affidavit submitted in connection with a motion for summary

judgment may contain hearsay statements that would be admissible at the trial under exceptions

to the hearsay rule.  *H. Sand & Co. v. Airtemp Corp*., 934 F.2d 450, 454-55 (2nd Cir. 1991).  The

supplemental affidavit from Harris clearly states that Harris's original affidavit is premised on

his personal knowledge based on his "experience and responsibilities" and/or his review of the

business records of Allstate.  (Doc. 32, Ex. A, ¶ 1).  The supplemental affidavit also states that

the documents Harris reviewed were "made and kept in the ordinary course of Allstate's

business as part of its personnel function or its day to day business."  (*Id*.).  This is sufficient to

overcome any hearsay objection precluding use of this information.  But for the fact that certain

documents were not attached to the affidavit, the evidence, including Harris's statements

concerning the absent documents would be properly considered by the court.  To the extent the

pertinent documents regarding Lowry are attached to the defendant's submission, they will be

considered because they fall within the business records exception.

### D.  Lay Opinion Testimony

Lowry asserts that the defendant is attempting to offer lay or expert testimony in

paragraph 18, cited above.  She does not particularize what portion of paragraph 18 she believes

contains objectionable opinion testimony.  (Doc. 30, ¶ 2).  Allstate responds that "Herb Harris is

offered by Allstate as a lay witness as the common denominator in the employment decisions

with respect to Lowry and similarly situated male employees.  He is not offered as an expert.

Arguably, *Federal Rule of Evidence* 701 does not apply as Harris is testifying to his thought

process and analyses in the performance of his duties as related to the employees under his

supervision."  (Doc. 30, p. 2).  To the extent Rule 701 is even applicable, Allstate asserts that

Harris's opinions and conclusions are "(a) rationally based on the perception of the witness and

20

(b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." (*Id.*, citing FED. R. EVID. 701).

The court has closely reviewed paragraph 18 and finds that for the most part it is Harris's rendition of events based on his observations and a review of Allstate records. To the very limited extent it contains Harris's assessments, the conclusions, at this juncture, appear to be the type of information that would fit squarely under the definition of lay opinion. The claim is therefore without merit. Again, however, to the extent that the testimony is premised on records not before the court, it is excluded.

### E. Rainey as a Comparator

In the closing paragraph of the motion to strike, the plaintiff objects to Rainey being identified as a comparator and therefore moves that any evidence concerning Rainey be stricken as irrelevant. (Doc. 30, ¶ 8). As noted previously, Allstate proffers Rainey as a male comparator who was terminated for performance reasons. Lowry disputes his efficacy as a comparator because Quinn did not evaluate or supervise him and was not involved in terminating him.[11] (*Id.*). Allstate does not address this aspect of the motion specifically in their responses. However, they do appear to be asserting that it is Harris's intent as a decision maker that is at issue, at least in part, in this matter. Presumably, the Rainey comparison is offered for that reason.

At the hearing on the motion, the plaintiff's counsel made it evident, as he has previously, that his claim of discrimination is premised only on the actions of Quinn. Premised on this representation, the fact that Quinn did not supervise Rainey, and the court's earlier

---

[11] Harris stated in his affidavit that Quinn was only involved in some of the counseling sessions involving Rainey. (Harris, ¶ 18).

determinations on the motion to strike, the court hereby finds that Rainey is not relevant for purposes of resolving the motion for summary judgment.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

22

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## IV. DISCUSSION

### A. Generally

The plaintiff asserts that her treatment and termination by the defendant were a consequence of discrimination. Specifically, she states that her termination was a result "of her being 'creatively written-up' by Quinn." (Doc. 31, p. 3). She also claims that she was discriminated against by Quinn in discipline. (*Id.*). Specifically, she states that it was "clear to all of the females who worked for Quinn that she did not like females and that she preferred men over women." (*Id.*). The defendant asserts that the plaintiff's claims are insufficient because the plaintiff cannot meet her burden of establishing a prima facie case and because she cannot retort the defendant's proffered legitimate, nondiscriminatory reasons for her termination. (Doc. 27, p. 29).

The appropriate framework from which to evaluate the plaintiff's claims under Title VII is the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973), standard when circumstantial evidence is involved. *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1310-11 (11th Cir.), *superseded in part on other grounds*, 151 F.3d 1321 (11th Cir. 1998). The plaintiff has the initial "burden of

establishing a prima facie case of [gender] discrimination." *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824.

In discharge cases such as this, the Eleventh Circuit has long held that the elements for a prima facie case require the plaintiff to show that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she was discharged, and (4) she was replaced by a person outside the protected class. *Lee v. Russell County Bd. of Education*, 684 F.2d 769, 773 (11th Cir. 1982). Similarly, in *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999), the Eleventh Circuit Court of Appeals stated:

> To establish a prima facie case of disparate treatment, Appellant must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job.

If a prima facie case is shown, the defendant must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824. If this is done, the plaintiff is required to show that the proffered reason was merely a pretext for the defendant's acts. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

### B. Prima Facie Case

The parties do not dispute that the plaintiff is a member of a protected group and that she was subjected to an adverse job action since she was discharged. They dispute whether she was subjected to disparate treatment and the reason for the termination. They also dispute whether she was qualified to perform the work. The sum and substance of the dispute centers around the

plaintiff's assertion that she was disciplined differently, and ultimately terminated, based on her sex and the defendant's assertion that it was her job performance that resulted in the disciplinary actions and her termination. However, before the inquiry proceeds to the second stage under *McDonnell Douglas*, the plaintiff must first establish a prima facie case.

As noted in *Jones*, 137 F.3d at 1311, "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." The defendant asserts that the plaintiff has not established a prima facie case because she has not demonstrated the existence of "any similarly situated male employee who has had similar performance problems as Lowry, but who was treated more favorably." (Doc. 27, p. 32). The defendant correctly points out that the plaintiff does not identify a male comparator.

The first issue before the court is whether the plaintiff has satisfied her initial burden. "A prima facie case of discriminatory discharge may be established in different ways." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984). "A plaintiff 'may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence.'" *Harrison v. Bush Hog Division of Allied Products Corp.*, 2000 WL 726910, *21 (S.D. Ala. 2000). In the context of circumstantial evidence, the plaintiff can establish her case by showing (1) she was qualified and yet was fired and then replaced by someone outside her class; (2) she was fired when others outside her class with similar qualifications are retained; or, (3) she was fired premised on "differential application of work or disciplinary rules."[12] *Nix*, 738 F.2d at 1185. This first example applies; but only if the plaintiff

---

[12] The plaintiff seeks to satisfy her burden via circumstantial evidence. The plaintiff does not argue that there is direct evidence of discrimination, nor does she present statistical evidence in support of a claim of disparate treatment. In reviewing the record, the only evidence that arguably could possibly constitute direct evidence consists of a statement by Quinn that "we want [to hire] people like Chris and Heath in our unit. Chris and Heath [both males]." (Lowry, pp. 85-86). The court, however, does not deem this statement to be direct evidence. *See Jones*, 151 F.3d at 1323 n.11 ("Direct evidence is evidence, which, if

demonstrates she is qualified.  Under either of the other examples, she must demonstrate that a

comparator exists.[13]  *See Jones*, 137 F.3d at 1311 (evidence of similarly situated employees must

be used to support plaintiff's prima facie case).

The plaintiff appears to be proceeding under the first scenario–that she was qualified,

terminated and replaced by someone outside her class.  Accordingly, she must show each of

those elements.  The last two criteria are not disputed.  She was terminated and replaced with a

male.  The defendant does contest that she was qualified.  In *Damon v. Fleming Supermarkets of

Florida, Inc.*, 196 F.3d 1354 (11th Cir. 1999), *cert. denied*, ___ U.S. ___, 120 S. Ct. 1962 (2000),

the Eleventh Circuit discussed the application of this element in the prima facie case analysis in

an age discrimination claim.  The court stated:

> . . . .  In age discrimination cases, our court focuses on a plaintiff's "skills and
> background to determine if they were qualified for a particular position." *Clark v.
> Coats & Clark*, 990 F.2d 1217, 1227 (11th Cir. 1993).  Our precedent holds that if
> a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or
> she is qualified to hold that particular position.  *See id.* (inferring a plaintiff's job
> qualifications from his 25 years of experience); *Pace v. Southern Railway System*,
> 701 F.2d 1383, 1386 n.7 (11th Cir. 1983) (finding that "where a plaintiff has held
> a position for a significant period of time, qualification for that position, sufficient
> to satisfy a prima facie case, can be inferred").  Based on the employment history
> of Damon and Kanafani, we can infer that they were qualified for their respective
> positions.  Appellants were store managers for more than a decade, and, by all
> accounts, had performed their jobs with distinction during the bulk of that period.
> Damon held the position of store manager for 34 years, and consistently received
> numerous awards, commendations, and merit raises. Kanafani was a store
> manager for 13 years, and also received his share of bonus awards and merit
> raises.

---

believed, proves the existence of the fact in issue without inference or presumption.  So, direct evidence of discrimination is
powerful evidence capable of making out a prima facie case essentially by itself.  This court has marked severe limits for the
kind of language to be treated as direct evidence of discrimination.").

[13] The plaintiff does not articulate any comparators that would support a prima facie case of disparate discipline or
discriminatory discharge.  Although she indicates that Quinn treated men, particularly Gray, differently (Lowry, pp. 88-89), there
is no evidence that he experienced similar perfomance deficiencies and was treated differently than the plaintiff.  To the extent
that she compares her situation to Jeri Dillard, another female in her unit, such a comparison is ineffective for purposes of
establishing a prima facie case of disparate disciplinary treatment.  Accordingly, this claim must fail.

In finding the Appellants unqualified, the district court incorrectly considered Fleming's allegations of Appellants' poor performance. Our caselaw quite clearly instructs that plaintiffs, who have been discharged from a previously held position, do not need to satisfy the *McDonnell Douglas* prong "'requiring proof of qualification.'" *Young v. General Foods Corp.*, 840 F.2d 825, 830 n 3 (11th Cir. 1988) (quoting *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987)). We have explained that the "'reason for this modification [of *McDonnell Douglas*] is that in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred.'" *Young*, 840 F.2d at 830 n.3 (quoting *Rosenfield*, 827 F.2d at 1495 n.2). We also have unambiguously held that allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered, only after a prima facie case has been established, when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination. *See Clark*, 990 F.2d at 1227 (holding that evidence of employee's performance reprimands does not establish that employee was unqualified, but may indicate company was legitimately concerned about employee's performance); *Young*, 840 F.2d at 830 n.3 (same). The district court therefore erred in concluding that Appellants were not "qualified" based on Fleming's allegations of poor performance.

*Id.*, 196 F.3d at 1360.

The defendant cites *Baker v. Sears Roebuck & Co.*, 903 F.2d 1515 (11th Cir. 1990), in support of its position that the plaintiff has not met her prima facie case because she was not qualified. *Baker* is factually distinguishable in that the plaintiff's lack of qualifications in that case was premised on "about 7 years of chronic substandard maintenance agreement sales." *Id.*, 903 F.2d at 1520. Similarly, however, Lowry's performance record is distinguishable from the plaintiffs in *Damon* who had 13 and 34 years of experience as managers of "distinction." *Id.*, 196 F.3d at 1360. Lowry had about 18 years experience as a claims representative or adjuster before working with Allstate. She had extensive experience in handling claims similar to those she worked on at Allstate. For approximately the first 15 months with Allstate she met their expectations with limited exceptions that were noted by the reviewers. It was her performance over approximately her last year that was substandard.

27

In view of the court's strong admonition in *Damon* on how the lower courts are to consider the defendant's allegations of poor performance when evaluating the plaintiff's prima facie case and the "non-onerous burden of establishing a prima facie case" the plaintiff has, the undersigned finds that the plaintiff has satisfied her burden in establishing her prima facie case on her termination claim. *Harrison*, 2000 WL 726910, at 23 (S.D. Ala. 2000).

### C. Legitimate, Non-retaliatory Reasons and Pretext

Once the defendant has articulated its legitimate, non-retaliatory reasons for the plaintiff's termination, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997) (citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).  This must include an evaluation of "whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538.  If it is "determine[d] that a reasonable jury could conclude that the employer's" articulated reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action." *Id*.

In evaluating whether the plaintiff has demonstrated pretext, the court must examine each of the proffered "legitimate reasons" for the termination and determine whether the plaintiff has

28

cast sufficient doubt on each to permit a reasonable factfinder to conclude that the purported "legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538-39. *See Mora v. University of Miami*, 15 F. Supp. 2d 1324, 1336 (S.D. Fla. 1998) (A plaintiff, nevertheless, can survive summary judgment by presenting evidence demonstrating a genuine issue of material fact as to the truth or falsity of each of the employer's legitimate, nondiscriminatory reasons), *citing Evans v. McClain of Georgia, Inc.*, 131 F.3d 964-65 (11th Cir. 1997)(citing *Combs*, 106 F.3d at 1530-32)).

The defendant premises its termination of the plaintiff on her poor performance. Specifically, Allstate asserts that she was terminated because she "failed to comply with key areas of her job responsibilities and had prolonged difficulty managing her files" (doc. 27, p. 35), "informal efforts to address Lowry's performance problems had not resulted in sustained or substantial improvement" (*id*. at 36), "formal efforts to address Lowry's performance problems also did not result in substantive improvement" (*id*.), and her "performance was not commensurate with her level of experience and training" (*id*.). The plaintiff responds that these reasons are pretextual premised on the fact that the record demonstrates that "it was clear to all of the females who worked for Quinn that Quinn did not like females and that she preferred men over women," that "[s]he made the comment that she wanted more people in her unit 'like' the two males working for her," that "[s]he was rude and condescending to female employees, including Lowry, and [she] was friendly to male employees and treated them with respect." (Doc. 31, p. 9). She also notes that in addition to this evidence of pretext, there is evidence that "Lowry opened significantly more files than Dillard and twice as many files as the male co-employee in her last year and that she closed as many files as Dillard and twice as many files as the male co-employee her last year at Allstate and neither Dillard nor the male even received one

discipline." (*Id.*, p. 10).

In reviewing the defendant's reasons, the court must keep in mind that the Eleventh Circuit Court of Appeals has stated that "a defendant may terminate an employee for a good or bad reason without violating federal law. . . . We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision. . . ." *Damon*, 196 F.3d at 1361 (citations omitted).

The record demonstrates that Lowry was having performance difficulties by at least her February 1997 evaluation. (Lowry, Ex. 9). Her manager and reviewer, Ms. Houk, commented that Lowry's "production has been consistent with the unit average. She does, however, have quality concerns relative to aggressive pursuit of specials from attorney's, injury documentation, and trial alert preparation." (*Id.*). The summary goes on to state that "[s]he has the knowledge and experience to correct these areas with minimal supervision." (*Id.*).[14] Lowry agreed with the evaluation and pledged to work toward improving her performance. (*Id.*, p. 2). The fact that she was having difficulty keeping up was further demonstrated by Lowry's January 13, 1997 note where she stated, "I admit I am behind on my diary follow up & that seems to be the problem." (Lowry, Ex. 10). She explains,

> I have worked very hard to try to keep up these files. The pending [list] has increased steadily over the last 2 years - This, I feel is due to our evaluation system & I should have been expected to increase the files I am able to get medicals on. I evaluate & attempt to move as fast as I can. I process colossus as quick as I can.
>
> I am a good employee - I keep my mail current. I have not missed work in over a

---

[14] The summary also noted that Lowry "received the MCO's Best of the Best award for her performance in the third quarter." (*Id.*).

year & I am never late for work.  I realize Allstate has requirements on the file
follow-ups but it is very difficult to meet all of the requirement (sic) at my desk.  I
am working 6 days a week now to try to do my work correctly, according to
Allstates (sic) requirements.  I am proud to work for this company and I do not
want to lose my job. . . .

(*Id.*).  In her deposition, Lowry stated that she was not able to follow up on letters she had sent to

attorneys as was required by company policy.  (Lowry, pp. 164-65).  She attributed this

deficiency to the workload.  (*Id.*, p. 164).  She further admits that she was having problems

keeping up with the work.  (*Id.*, pp. 111-12).  However, she also candidly acknowledges that

gender was not a factor in her workload assignments, nor in the workload assignments of the

male adjuster, Gray.  (*Id.*).  She attributes the high caseload to the type of claims she handled –

bodily injury.  She and Dillard were the only adjusters handling those types of claims.  Gray,

handled "minor impact soft tissue claims."  (*Id.*, p. 72).  Her performance problems under Houk

were also demonstrated by Houk's January 29, 1997, memorandum letter to Lowry discussing

her (Lowry's) unsatisfactory handling of a claim file that resulted in Allstate incurring additional

expenses due to the fact that outside counsel would have to be retained to represent Allstate in

the resulting lawsuit.  (Lowry, Ex. 11).  Lowry was informed that if such deficiencies were seen

again, further corrective action would be recommended.  (*Id.*).  Lowry did disagree with the

degree of seriousness attributed by Houk to the deficiencies, but she acknowledged she would

"be more accurate on my follow-up contacts in the future."  (Lowry, p. 167; Lowry, Ex. 11, p.

3).  At her deposition, Lowry stated that gender was not a basis for Houk's criticism of her.

(Lowry, p. 168).

　　　　Lowry was written up and counseled again on March 4, 1997, by Houk for demonstrating

poor judgment in the handling of liability issues in another file.  (Lowry, Ex. 12).  Nothing in the

record demonstrates that the criticism was unjustified or unfounded.[15]  (Lowry, pp. 168-70).  On

March 10, 1997, Houk again questioned Lowry's reason for closing a file.  Upon examination,

Lowry concluded that the file was closed by her in error.  (Lowry, Ex. 13).  Nothing in the

record demonstrates that Houk's criticism was unjustified or unfounded or based on Lowry's

gender.  (Lowry, p. 172).  Lowry was similarly questioned on May 19, 1997, by Houk about her

mishandling of a file.  She again did not provide a satisfactory explanation for her actions.

(Lowry, Ex. 14).  Nothing in the record demonstrates that the criticism was unjustified or

unfounded or that it was based on Lowry's gender.  (Lowry, pp. 172-74).  In Lowry's April 8,

1997 submission of ten files for Allstate's "Winning Negotiations" program, eight were deemed

by Houk to be unacceptable due to the lack of "any aggressive handling" of the claims on her

part.  (Lowry, Ex. 15) (emphasis in original).  Nothing in the record demonstrates that the

criticism was inaccurate.  (Lowry, pp. 174-76).  Additionally, Houk questioned Lowry's

handling of various claims on three additional times.  (Lowry, Exs. 16, 19, 20).  Lowry stated in

her deposition that the last write-up in the series (Lowry, Ex. 20) was not accurate.  (Lowry, pp.

186-88).  However, she did not demonstrate how it was inaccurate.  Additionally, she did not

dispute its accuracy at the time Houk wrote it.  (*Id.*).  Houk also wrote Lowry up for improper

coding on June 10, 1997.  (Lowry, Ex. 17).[16]

Finally, it was Houk who did the "Requires Improvement Evaluation" on Lowry in

November 1997.  (Lowry, Exs. 21, 22).  As noted above, although Quinn's name is not on the

---

[15] The plaintiff could offer no challenges to the assessment without reviewing the pertinent flies, which she has failed to review and adequately challenge for purposes of this motion.

[16] When Lowry was questioned about this coding violation during her deposition, she stated that Houk was noting this error in an attempt to move her out of the unit to make room for another male.  (Lowry, p. 181).  She further stated that this was at the "bidding" of Quinn.  (*Id.*).  However, when probed further about this, she was unable to substantiate the claim.  (*Id.*, pp. 181-82).

document as an approving individual, the plaintiff asserts she must have been involved in the evaluation as she was Quinn's supervisor.  (Lowry, p. 196).  Nothing in the file, however, indicates that the negative evaluation was premised on anything other than Houk's observations.  Houk also performed the required 30 day follow-up review on November 26, 1997, finding that there was no "sustained or substantial improvement" in Lowry's overall handling of her claim files.  (Lowry, Ex. 23).  At her deposition, Lowry challenged certain of the assessments in Houk's review.[17]  Quinn and two other persons conducted the next 30 day review, making note of the absence of "[s]ubstantial improvement."  (Lowry, Ex. 24).  Quinn conducted the January 1998 "Job in Jeopardy" review, which was premised on Lowry's continued "unacceptable claim handling."  (Lowry, Doc. 25).  The plaintiff did not at the time of the review and does not now

---

[17] Specifically, Lowry  stated that there was nothing wrong with the handling of file number 1844273423 because there was only about an eight day delay in reviewing this file at the time of the examination. (Lowry, pp. 313-14).  She states that they were doing reviews on 30 to 40 day periods.  (*Id.*).  To accurately assess this file, it is necessary to reproduce the entire notation:

> MLL ([Lowry])assumes 07/15/96.  First follow up with attorney 12/12/96.  02/02/97 -
> meds received.  Next contact with attorney 06/03/97 for wage loss.  08/13/97 follow up -
> LWTC. 11/18/97 next follow up.  File is not moving to disposition.  Attorney contacts
> and follow ups sporadic.

(*Id.*, p. 2).  It appears to the court, assuming that the last review was only eight days overdue as suggested by the plaintiff, that the plaintiff has not disputed that the contacts and follow ups in this file were sporadic based on her own statement that the reviews are done every 30 to 40 days.

  Lowry also disputes the conclusion that the next listed file (1843967074) was lacking in disposition efforts.  (Lowry, p. 315).  A review of the activity on the file by the court demonstrates that there were numerous contacts during a two year period.  (Lowry, Ex. 23, p. 2).  As to the next contested file (1844031185), the plaintiff asserts that there was nothing wrong with her handling of that file.  (Lowry, p. 315).  As best the court can tell from her answers, she was referring to the time between the last entry and the date of the file review for purposes of the 30-day follow-up.  (*Id.*, pp. 315-16).  What the plaintiff fails to address is the actual deficiency that was noted.  The summary states:

> This is a U/M [uninsured motorist] claim that you should be directing.  Your 11/08/97
> entry to defense counsel requesting them to evaluate your claim and give you an opinion
> as to value. (sic)  This is your accountability.

(Lowry, Ex. 23, p. 2).

  A fair reading of the contested exhibit (number 23) shows that of the eight reviews conducted on the various files, the status of one file was "ok" (1844020303) and one other file (1843967074) appears to have been worked more extensively than the assessment may have properly credited.  This still leaves six deficient files unexplained.  This is seventy-five percent of the files reviewed.

specifically dispute the accuracy of the file deficiencies that were noted in the January 1998 review. Instead, she complained at her deposition that no one with Allstate provided her with the needed assistance when she requested it.[18] (Lowry, pp. 207-08).

Lowry also received a negative evaluation from Eddie Jeely, the Evaluation Consultant, when he conducted a "screen" review of various files submitted by the adjusters, including Lowry, in connection with the "Winning Negotiations" program. Of the three adjusters reviewed, Lowry, James and Dillard, the plaintiff by far had the worst assessment with many of her "screens" showing that information was not current. (Lowry, Ex. 27).[19] The plaintiff does not dispute the accuracy of Jeely's assessment.

Quinn wrote up the January 23, 1998 "Job-In-Jeopardy" review on Lowry. It again noted various procedural deficiencies. (Doc. 29). The plaintiff does not dispute the accuracy of the evaluation. Quinn also wrote up the February 6, 1998 "bi-weekly" review which again states that Lowry evidenced no "immediate and substantial improvement." (Lowry, Ex. 31). During the February 9, 1998 meeting with Hill and Quinn, Lowry resigned when she was told that she was going to be terminated premised on their recommendation. (Lowry, pp. 241-42 & Ex. 32).

The foregoing clearly demonstrates that Lowry had performance problems for more than one year. Many of her problems and deficiencies manifested themselves well before Quinn became her direct supervisor. There is no evidence that Houk's assessment of Lowry was improperly premised on directions from or conduct attributable to Quinn. Additionally, Lowry

---

[18] Lowry asserts in her deposition that her files were "targeted and written up to make it look really bad." (Lowry, p. 212). Lowry could offer no specific errors to support her claim. She asserted that she would need to review the files to identify any inaccuracies. (*Id.*, p. 213). The record does not contain any evidence that the plaintiff went back and reviewed any files and articulated the purported errors.

[19] Only one of Dillard's "screens" was not current and all of James's were current. (Lowry, Ex. 27). Lowry stated at her deposition that the information that was not located on her "screen" was available elsewhere. (Lowry, p. 219).

has not demonstrated any noteworthy deficiencies in the detailed case management problems

apparent from a review of Allstate's documentation of her performance.  Although she states in a

conclusory fashion that she was "'creatively written-up' by Quinn," the record does not support

this conclusion.  (Doc. 31, p. 3; Lowry, pp. 125, 317).

### 1. Lowry's assessment of Quinn's personality traits

In support of her assertion that she has shown that the proffered reasons are pretextual,

Lowry relies heavily on the claim "that it was clear to all of the females who worked for Quinn

that Quinn did not like females and that she preferred men over women."  (Doc. 31, p. 9, citing

Lowry, pp. 84-88).  Specifically, she states:

> She was rude and condescending to female employees, including Lowry, and was
> friendly to male employees and treated them with respect.  (*Id*.).  A current
> female in Quinn's unit, Jennifer James, testified that Quinn treated male
> employees differently from female employees and conceded that she may have
> made the statement with respect to Quinn, "Is it me or does she hate women?"
> (Pages 9-19, Deposition of Jennifer James).  James further testified that she had
> heard other female employees make similar statements, including Nancy Pugh,
> Lowry, and perhaps, Christy Colquit (sic).  *Id*.  Gerri (sic) Dillard, another female
> employee who used to be in Quinn's department testified that she also had heard
> comments similar to the one made by Jennifer James, et al., about Quinn from
> other females in the office.  (Pages 20-21; Deposition of Gerri (sic) Dillard.)  She
> further testified that she transferred out of Quinn's department because of
> treatment by Quinn.  *Id*.  Even in the affidavit submitted by defendant in support
> of summary judgment, the former employee, Christy Colquit (sic), provided that
> she had observed Quinn treating Lowry worse than the way Quinn treated men
> and that she observed that Quinn generally treated men better than females.
> (Paragraphs 11 and 12; Affidavit of Christy Colquit (sic).)

(Doc. 31, pp. 9-10).

The plaintiff stated in her deposition that Quinn was "very rude and condescending and

was not open for back-and-forth type conversation" and her demeanor, facial expressions and

tone of voice would change when she was dealing with a man.  (Lowry, p. 88).  In *Smith v.

Leggett Wire Co.*, 220 F.3d 752 (6th Cir. 2000), the court stated that a "plaintiff may demonstrate

that the defendant's explanation was merely pretext by showing (1) that the proffered reason had

no basis in fact, (2) that the proffered reason did not actually motivate the termination, or (3) that

the proffered reason as not sufficient to motivate the discharge." *Id.*, 220 F.3d at 759 (citing

*Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Lowry appears

to be asserting that this evidence fits the second example cited above. As stated by the court in

*Smith*, she "attacks the employer's explanation 'by showing circumstances which tend to prove

an illegal motivation was more likely than that offered by the defendant.' *Manzer*, 29 F.3d at

1084. 'In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of

discrimination makes it "more likely than not" that the employer's explanation is a pretext, or

coverup.' *Id.*" *Smith*, 220 F.3d at 759.

The plaintiff's assessment of Quinn's demeanor, expressions and tone is not sufficient to

demonstrate that the defendant's stated reasons for the termination were pretextual. Although

not to be ignored in the overall consideration of this issue, standing alone, her observations are

not adequate.

### 2. Conclusory assertion that Quinn did not like females and preferred men over women

Lowry testified at her deposition that

> . . . . Jackie's [Quinn] temperament and demeanor was - - She was
> the kind of person you didn't know what to take from her on a day-
> to-day basis. She was not very friendly towards me or other
> females in the office.
>
> It was really kind of a known thing throughout the office
> that she didn't work well or get along or like the females in the
> office. It was an obvious thing that she preferred the men over the
> women. That was not just an impression of mine, it was
> throughout the office.

(Lowry, p. 85). When questioned further about specifics, Lowry stated:

In her actions, one-to-one conversations with Jackie were
- - She was very rude.  She was very moody.  You could see the
difference in her if I approached her with a question and her
reaction to the question, whatever it was.  I mean, just in an overall
- - I don't have a specific incident.

But I do recall her demeanor towards me, she was just very
rude and condescending and was not open for back-and-forth-type
conversations.  It was more or less: This is the way it's going to be.
Your thought doesn't matter to me.  This is the way its going to be.

Now, when - - On the opposite end of that, if a man or
Heath [Gray] approached, her whole demeanor would change, the
expressions on her face would change, her actions, the tone of her
voice would change.

(*Id.*, pp. 87-88).  Lowry went on to acknowledge that her questions would be answered, but she

objected to Quinn's tone and demeanor.  (*Id.*, p. 88).[20]  Lowry also noted that when she asked

for assistance with her files, she was turned down by Houk and Quinn.  (*Id.*, p. 89).  Specifically,

Lowry states that when she asked to have Heath Gray take on some of her work, she was turned

down.  (*Id.*).  Houk and Quinn told her that she should be able to do her own work.  According to

Lowry, Dillard was also behind in her work.  (*Id.*).  In a second example, Lowry states that Houk

and Quinn were not discrete in their handling of "situations."  (*Id.*, p. 119).  They would say

"things out loud in front of the group.  Implying that [she] didn't know what [she] was doing.

Talking down to [her] like [she] had no business being there."  (*Id.*).

In a similar vain, Jennifer James's deposition contains the following colloquy:

Q. . . .  Did you ever make the statement that quote - - let me find
it here - - is it me or does she hate women in reference to Ms.
Quinn?

_____

[20] At another point in her deposition, Lowry stated that the men were "dealt with more professionally than the women
were." (Lowry, pp. 123-24).  According to her testimony, Quinn "seemed more interested in talking to Heath [Gray] about
things than she would in talking to [her] or to a female." (*Id.*, p. 124).

A.  I may have.[21]

Q.  What prompted you to make that statement, if you did?

A.  I don't recall at this time what it would have been.

Q.  At some point, did you feel like Ms. Quinn was treating women worse that the men in the unit?

A.  Differently, not necessarily worse, I don't think.

Q.  Well, do you recall what would have prompted you to make that statement, if you made it?

A.  I - - Again, I don't recall exactly what the circumstances would have been that prompted me to make that statement.

Q.  Did you ever hear anybody else make similar statements?

A.  Yes.

Q.  Who?

A.  It would be Lee Ann Lowry or Nancy Pugh or - -

Q.  How about Gerry Dillard?

A.  I don't recall ever hearing Gerry say anything about that.

Q.  How about Peggy Tumlin?

A.  No, I don't recall ever hearing Peggy say anything like that.

Q.  Okay. So, you think Nancy or - - Nancy Pugh or Lee Ann Lowry may have?

A.  May have, yes.

Q.  What about Colquitt?

A.  Christy Colquitt?

---

[21] Lowry testified at her deposition that after a meeting, James stated, "What is with her [Quinn], does she just not like females, or what?  (Lowry, p. 121).

Q. Right.

A. May have, but I don't - - again, I don't recall.

(Doc. 31, Jennifer James deposition, pp. 9-11).  Ms. Dillard's deposition provides:

Q. Okay.  Before you left Unit M in March of 1999 and the two

years before that, had you submitted a resignation?

A. Yes.

Q. About when was that?

A. I believe it was in October.

Q. '97.

A. '97.

Q. What was the reason for that?

A. I - - felt that Jackie [Quinn] had said some harsh words to me in front of the other people, and I just didn't think that I wanted to work under those type situations.

Q. Did you ever have a conversation with Lee Ann Lowry wherein either one of you said or said in substance that you believed that Ms. Quinn did not like women?

A. I don't recall any conversation like that, no.

Q. Or that she treated men better than she treated women?

A. Not that I can recall, no.

Q. Do you ever recall anybody saying quote is it me or does she hate women close quote?

A. I have heard that type of gesture in the office before.

Q. Do you recall who said it?

A. No.

Q. Do you remember maybe that Jennifer James said that in a real loud voice?

A. I don't remember.

Q. But you never said anything like that?

A. No.

Q. You are certain?

A. Not that I'm aware of.

Q. You realize you are under oath here just as if you were in the courtroom?

A. That's true.

Q. And you're testifying under oath –

A. Right

Q. – that you never said anything about Ms. Quinn either treating women worse than men, not liking women or hating women?

A. Not that I recall, no.

Q. Okay.  So, you never said anything like that?

A. Not that I recall.

Q. So, if other people said you said it, is it because they remember better than you or they're not telling the truth?

A. I don't know.  You would have to ask them that question.  All I know is I do not recall saying anything like that.

Q. Did you ever feel that Ms. Quinn treated men better than women?

A. I may have had some feelings about that.

Q. Okay.  And do you recall why you felt that way?

A. She seems to be more friendly with the male gender than

female, but as far as our work is concerned, there is no difference.

Q. You didn't ever feel like she was harder on women than men?

A. No.  I think we all had the same standards.

Q. Well, how do you know what their standards were?

A. Well, we had our guidelines that we all worked.

Q. Well, do you know what their guidelines are?

A. Everybody is the same.

(Dillard, pp. 20-23).  Lastly, Colquett stated in her affidavit:

> 11.    On more than one occasion, I witnessed Sherry Houk or Jackie
> Quinn talk with Lee Ann [Quinn], in the open, about concerns that each had about
> Lee Ann's work or her handling of a file.  I was not familiar with the details of
> the individual files Lee Ann handled and, therefore, was not knowledgeable about
> the specific concerns raised by Ms. Houk and Ms. Quinn in their conversations
> with her.  On the occasions that Sherry Houk or Jackie Quinn talked with Lee
> Ann about her work performance in the open, although voices were raised, there
> was no name-calling or shouting.  I felt, however, that whatever concerns they
> had about Lee Ann's work should have been discussed with her in private, not in
> the open where other employees in the office could hear.  I never saw Ms. Houk
> or Ms. Quinn have performance related discussions with any other adjusters in the
> Represented unit, in the open where others could hear.  My work was never
> criticized in this manner.
>
> 12.    During the time that I worked for Allstate, I notice that Jackie
> Quinn was more chit-chatty and flirtatious with the male employees during work-
> related and non-work-related discussions.  With the female employees, she was
> just business-like.  I never heard Ms. Quinn make any statements expressing a
> preference for male employees over female employees.  In my observation, other
> than what I have already mentioned in this affidavit, Ms. Quinn did not treat male
> and female employees differently regarding work-related issues.

(Doc. 28, Ex. E (Colquett affidavit), ¶¶ 11-12).

Quinn testified at her deposition that Jennifer James, Jeri Dillard, and Christy Colquitt,

among others, commented "on how mean Jackie [Quinn] and Sherry [Houk] were to [her

(Lowry)] and how they did not treat the guys that way." (Lowry, pp. 118-19).  Other than

41

concerning James, Lowry did not specify what they said or when they said it. Lowry

acknowledged that Mary Sproul, another female employee, was treated well because she was an

excellent employee. (Lowry, pp. 121-22). Lowry commented at the deposition that she did not

know if the male employees were criticized. (*Id.*, p. 122). She did acknowledge that Rainey's

work was criticized by Houk and Quinn. (*Id.*, pp. 122-23).

The court finds that this testimony is insufficient to warrant the denial of the motion for

summary judgment. In *Gartman v. Gencorp, Inc.*, 120 F.3d 127 (8th Cir. 1997), the plaintiff sued

her former employer for constructive discharge premised on gender discrimination in violation

of Title VII. The evidence adduced at the trial demonstrated that the plant where the plaintiff

was working "had the worst quality record" of all of its main customer's suppliers. Because of

this, the company decided to either terminate or transfer the plant's management team. Three

managers were fired and the plaintiff and two others were offered transfers. The plaintiff

declined the transfer and ultimately filed suit. As part of her trial evidence, the plaintiff offered

testimony that included rude comments by upper management. Included was the following

statement by the division vice president when the plant's main customer named a woman to

monitor production quality: "S- -t, another gal." The individual testified that the statement was

made "out of frustration with the job performance of a[nother] female member" of the

purchasing group. *Id.*, 120 F.3d at 129. The plaintiff also introduced testimony that the

company's division president told her "she did not know 'how to belly up to the bar,'" and he

"called her 'kid' in a patronizing manner, and advised her not to show her ignorance by referring

to an engine when she meant a block." *Id.*

Examining this evidence, the court held that "although [plaintiff] Gartman might have

felt belittled by [the division president], [his] rude comments were devoid of gender-conscious

terms and thus did not imply a discriminatory attitude toward women as women." *Id.*, at 131.
The comment by the division vice president, while "gender conscious," was an "impulsive
remark, uttered in a passing moment of frustration, [that] bore no relation to the decisional
process." *Id.* The court accordingly, reversed the lower court's denial of a motion for a
judgment as a matter of law.

The above observations by Lowry and the others simply do not present the type of
evidence necessary to retort the articulated reasons for the termination offered by the defendant
and supported by the record before the court. This is particularly true in light of the undisputed
evidence that Mary Sproul, an excellent female employee, was treated well. Still further, Dillard
testified that there was no difference in Quinn's treatment of women "as far as our work is
concerned." (Dillard, p. 23). As stated above, the court has considered Lowry's observations in
its evaluation, but finds them lacking in force and effect to prevent the granting of the
defendant's motion for summary judgment.

### 3. Quinn's statements

#### a. The performance of Chris Zaragoza and Heath Gray

The plaintiff also asserts that Quinn's discriminatory intent is evident in her statement
that "she wanted more people like the two males." (Doc. 31, p. 10). Because of the significance
Lowry places on this statement, it is appropriate to recite the entire colloquy:

> Q. With respect to you, Ms. Lowry, in what ways did Ms. Quinn
>
> express a preference for men in the office over you.?
>
> A. She made the comment at one time - - I think they were trying to hire
> some people or something. She made a comment that we want people like Chris
> [Zaragoza] and Heath [Gray] in our unit. Chris and Heath are two guys.

Q. And you interpreted that statement as a discriminatory statement?

A. Yeah, I did.

Q. Why?

A. Because why wouldn't she have said we want good people, as opposed to two guys.

Q. Did she say two guys or did she say Chris and Heath?

A. Chris and Heath.

. . . .

Q. Do you have any knowledge about the quality of Mr. Zaragoza's work?

A. No.

Q. Do you know whether or not Mrs. Quinn was pleased with Mr. Zaragoza's work?

A. Personally, I don't know.

Q. Do you know anything about Mr. Gray's quality of work?

A. No.

Q. Do you know whether or not Ms. Quinn was pleased with the quality of Mr. Gray's work?

A. I don't know.

Q. Could she have been referring to the quality of their work when

she made that statement?

A. Could have been.

(Lowry, pp. 86-87). When placed in context, this again is insufficient to warrant denial of the

motion for summary judgment.

### b. Other statement by Quinn

Lowry also testified at her deposition that on some unspecified date, she heard Quinn state after conducting an interview, "If she's that cute, we don't want her here in our department." (Lowry, pp. 334, 338-39). According to Lowry, Quinn was referring to the woman she had just interviewed for an adjusters position. (*Id.*, pp. 339-40). The parties agree that this statement does not constitute direct evidence of discriminatory intent. After consideration of the statement in the light most favorable to the plaintiff, the court is not satisfied that this statement constitutes probative evidence of Quinn's purported discriminatory intent. It does not show gender discrimination, but demonstrates, at most, that for whatever reason, she did not want to have a "cute" person in her department. Although she made the statement after interviewing a female candidate for the adjuster position, nothing demonstrates that the comment was gender based. It is somewhat akin to the statements of the vice president in *Gartman*, which the court found to be inappropriate, but not necessarily "gender conscious," "imply[ing] a discriminatory attitude toward women as women." *Gartman*, 120 F.3d at 131. Quinn's statement does not imply a discriminatory attitude toward women, but evidences that she does not want individuals with a "cute" appearance. This does not support the plaintiff's claim of gender discrimination under the circumstances.

### c. Other undisputed facts

The plaintiff also asserts that the defendant's discriminatory intent is evidenced by certain uncontested facts: (1) she opened significantly more files than the other adjuster who performed the same type of reviews (Dillard) and she closed as many files as Dillard; (2) she opened "twice as many files as the male co-employee [(Gray)] in her last year" and she "closed twice as many files as the male co-employee her last year;" (3) neither Dillard nor "the male co-

45

employee" received one disciplinary; and (4) she was replaced with a male. (Doc. 31, p. 10).

The first two facts are not particularly significant because the plaintiff was not terminated for matters dealing with the number of files opened or closed, but because of the quality of her performance. Additionally, with regard to the third fact, it must be remembered that Dillard is not a comparator for two reasons: (1) Dillard is a female and (2) there is no articulable, specific evidence that her work, or more importantly, any male's work, suffered from the same or similar deficiencies attributed to the plaintiff's performance.

The colloquy at Lowry's deposition included the following concerning Dillard:

> Q. Now, you have reviewed your coworker's (Dillard) diary, have you not?
>
> A. Yes.
>
> Q. And is it true that her files were in about the same condition yours were?
>
> A. That's correct.
>
> Q. And was she written up?
>
> A. Not to my knowledge.
>
> Q. Now, is it the crux of your position in this case, not that you never did anything wrong, but that you were being creatively written up on a regular basis in order to get rid of you?
>
> MS. STADEKER: Object to the form.
>
> Q. You many go ahead and answer.
>
> A. I think that's true.

(Lowry, pp. 316-17) (see also *id.* at pp. 125-26). Even though the male co-employee that plaintiff most-often complains about, Gray, did work in the same unit, he did not work the same type of claim files that she did. Thus, he is not an appropriate comparator. Further, there is no evidence he had the performance deficiencies attributed to the plaintiff. In fact, she stated at her

deposition that she did not know anything about Gray's work quality.   (Lowry, pp. 86-87).

Additionally, other than the plaintiff's general statements quoted above, there is nothing to

demonstrate that either Dillard and Gray were treated more favorably than the plaintiff.  Her

conclusory, unsupported observations concerning Dillard's diary are not adequate to defeat the

defendant's motion.

The last fact, that the plaintiff was replaced by a male, is not disputed.  It also was part of

the evidence the court considered in finding that she established a prima facie case.  It is not,

however, enough to demonstrate that the defendant's proffered reasons are pretextual.

### 4. Workload issue

The court has also examined Lowry's workload from October 1995 through her

termination in relation to Dillard, who handled the same type of files, to see if a discriminatory

pattern can be discerned.  Nothing in the record demonstrates that Quinn improperly singled her

out for additional assignments.[22]  To the contrary, the record reveals that Lowry began receiving

cases immediately after she was hired.  She appears to have reached a full load around February

1996.  (Lowry, Ex. 6, p. 1; Harris, attachment D0661-67).  Shortly after this time, around June

1996, Dillard began working the bodily injury claims formerly assigned to Murray.[23]  Thereafter,

the cases appear to have been randomly assigned by Colquett, Lowry's "good friend," over the

next year.[24]  A review of the statistical reports does not evidence any discriminatory pattern in

the assignment of files.  (See Harris, attachment D0661-89).  The mere fact that she had more

---

[22] At the hearing on the motions, the plaintiff's counsel informed the court that the workload statistics were offered to demonstrate the plaintiff's productivity in relationship to the other employees in her unit.

[23] Allstate's records demonstrate that Murray's cases were transferred to Dillard in June 1996. (Harris, attachment D0669).

[24] Colquett states in her affidavit that she would distribute the new files by alternating between Dillard and Lowry. (Colquett, ¶¶ 5-6).

47

files than the other adjusters is not sufficient to demonstrate that the defendant's reason for terminating Lowry was pretextual.  This is particularly true in view of the fact that the assignment of cases was effectively explained by Colquett's affidavit.  Still further, only Dillard performed the same type of review as the plaintiff and the court does not deem her to be a comparator who demonstrates that the defendant's asserted reasons for its action were pretextual.

### 5. Other matters

In reviewing the evidence, the court also cannot ignore the testimony of the plaintiff that Quinn, as well as Houk, similarly treated Rainey poorly.  (Lowry, pp. 122-23).  The court cannot ignore the fact that the plaintiff's performance deficiencies started well before Quinn was her supervisor.  Although the plaintiff asserts that some of the earlier criticism of her was precipitated or backed by Quinn, the record does not support her conclusory conclusion.

## V. CONCLUSION

Premised on the foregoing, the court finds that the plaintiff's motion to strike (doc. 30) is due to be granted in part and denied in part.  The court further finds that the defendant's motion for summary judgment (doc. 27) is due to be granted and the case be dismissed with prejudice.

**DONE**, this the __29th__ day of December, 2000.

**John E. Ott**
United States Magistrate Judge

48